IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FAHEEM RODGERS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 25-CV-6848 |
| MONTIUM, | : | |
| Defendant. | : | |

**MEMORANDUM**

**Judge Juan R. Sánchez** **October 27, 2026**

The Court dismissed Faheem Rodgers's Amended Complaint asserting Title VII claims against his former employer because he failed to plausibly plead employment discrimination based on his race, color, or perceived religion.[1] *Rodgers v. Montium*, No. 25-6848, 2026 WL 1893900 (E.D. Pa. June 30, 2026) ("the June Memorandum"). Rodgers was granted leave to file a second amended complaint if he was able to assert additional facts to cure the defects identified in his claims. He timely filed a Second Amended Complaint (ECF No. 14, "SAC"). Because Rodgers alleges sufficient factual allegations to support some but not all of his claims, the Court will dismiss the SAC in part, while permitting Rodgers's Title VII color-based employment discrimination, religion-based hostile work environment, and retaliation claims to proceed.

[1] The Court had previously dismissed Rodgers's initial Complaint in part while permitting his Title VII color-based employment discrimination claim against Montium to proceed. *See Rodgers v. Montium*, No. 25-6848, 2026 WL 1079294 (E.D. Pa. April 21, 2026) ("the April Memorandum"). However, in the Amended Complaint, Rodgers did not reallege the facts supporting his color-based discrimination claim, which the Court therefore dismissed without prejudice. *June Memorandum*, 2026 WL 1893900 at *3.

## I. FACTUAL ALLEGATIONS[2]

The facts alleged in the SAC largely mirror those in his prior pleadings, while providing additional details. On or about July 6, 2023, Rodgers was hired by Defendant Montium as a maintenance engineer at the company's apartment community called The Avenue at East Falls. (SAC ¶ 34.) He began work for the company on or about July 28, 2023. (*Id.* ¶ 35.) On or about Rodgers's first day at work, Joe Klapper, a Turn Manager at Montium, observed Rodgers eating a bacon, egg, and cheese sandwich and chastised him in front of another co-worker for eating pork, stating "Muslims can't eat pork." (*Id.* ¶¶ 47-48.) Rodgers responded by telling Klapper that he is Christian and not Muslim. (*Id.* ¶ 49.) But Klapper did not apologize or acknowledge his mistake, and instead "continued treating [Rodgers] as though [he] was Muslim." (*Id.* ¶ 50.) On or about August 8, 2023, Klapper again observed Rodgers eating bacon. (*Id.* ¶ 51.) With other employees present, Klapper told Rodgers, "You shouldn't be eating pork . . . fake Muslim." (*Id.* ¶ 52.) Rodgers states that he "found this comment humiliating and degrading because it mocked [Klapper's] perception of [Rodgers's] religion in front of his coworkers." (*Id.* ¶ 53.) Rodgers states he "was embarrassed by the comment and believed it undermined his professional standing and credibility among other employees." (*Id.* ¶ 54.) On or about August 10, 2023, Klapper asked Rodgers, "[w]hy did your parents name you Faheem?" and "[w]hat does Faheem mean?" (*Id.* ¶¶ 55-56.) Rodgers answered the questions and again explained that he was Christian. (*Id.* ¶ 57.) Klapper "continued questioning [Rodgers] regarding [his] religious background and heritage." (*Id.* ¶ 58.) On or about August 16, 2023, Klapper again questioned Rodgers about his name and background, asking, "Why is your middle name Hasan if you're not

---

[2] The facts set forth in this Memorandum are taken from Rodgers's Second Amended Complaint (ECF No. 14). The Court adopts the pagination assigned to the SAC by the CM/ECF docketing system.

Muslim?" (*Id.* ¶ 60.) Rodgers again explained that he was Christian. (*Id.* ¶ 61.) Nevertheless, Klapper "continued assuming Plaintiff was Muslim and continued making comments reflecting that belief." (*Id.* ¶ 62.) For example, throughout Rodgers' employment, "Klapper repeatedly commented on [Rodgers'] beard." (*Id.* ¶ 63.) On numerous occasions, Klapper "stated that [Rodgers] should shave his beard because [he] 'looked like an Akh.'" (*Id.* ¶ 64.) Rodgers understood the term "Akh" to be a slang term for a Muslim man. (*Id.* ¶ 65.) Rodgers alleges that "[t]hese comments occurred repeatedly throughout [his] employment" with Montium and estimates that Klapper "made comments concerning [his] beard, appearance, name, or perceived religion nearly every workday after August 2023." (*Id.* ¶¶ 66-67.) Rodgers states that he "repeatedly advised . . . Klapper that the comments were unwelcome" and "repeatedly reminded" Klapper that he was Christian, but the comments continued, and were witnessed by other employees. (*Id.* ¶¶ 68-71.) "As the comments continued, [Rodgers] became increasingly embarrassed, anxious, humiliated, and apprehensive about reporting to work" and believed "the repeated comments were intended to ridicule him because of his race, color, appearance, and Defendant's perception[3] of his religion." (*Id.* ¶¶ 73-74.) Rodgers states that "other maintenance employees were not repeatedly questioned regarding their names, religious beliefs, facial hair, or dietary choices" and believes he was singled out because he is African-American, dark-skinned, and was perceived as Muslim. (*Id.* ¶¶ 77-79.)

[3] Rodgers refers several times in the SAC to "Defendant's perception" of him or to "Defendant's unequal treatment" of him, in describing Klapper's actions or beliefs, appearing to conflate Klapper and Montium. (*See also* SAC ¶ 21 (asserting that "[w]henever this Complaint refers to actions taken by Defendant, those allegations include the actions of Defendant's officers, supervisors, managers, Human Resources personnel, and employees acting within the course and scope of their employment or with actual or apparent authority on Defendant's behalf.").) As discussed below, Rodgers cannot simply impute Klapper's discriminatory views or behavior to Montium in order to state a Title VII claim.

Rodgers alleges his adverse treatment by Klapper extended to work assignments, and that Klapper "routinely assigned [him] additional maintenance and cleaning duties that were not assigned to similarly situated maintenance employees." (*Id.* ¶ 83.) Other employees "were permitted to decline certain assignments or were not expected to perform the same additional work required of [Rodgers]" which he "nevertheless completed . . . because he wanted to perform his job successfully and avoid disciplinary action." (*Id.* ¶¶ 84-85.) Rodgers "believed the unequal treatment was motivated by Defendant's perception of [his] race, color, and religion[.]" (*Id.* ¶ 86.)

By October 2023, Rodgers "concluded that the discriminatory conduct would not stop unless he reported it to management." (*Id.* ¶ 88.) He met with Property Manager Mark Katz and reported the pattern of Klapper asking him questions and making comments regarding his appearance, diet, and religion, as well as the unequal treatment Rodgers had experienced in workload and assignments from Klapper. (*Id.* ¶¶ 89-94.) But "[r]ather than investigating [Rodgers's] complaint[,]" Katz "questioned [Rodgers] whether [he] actually was Muslim" and asked what his first name meant. (*Id.* ¶¶ 95-96.) Rodgers explained that he is Christian and had repeatedly told Klapper that he was Christian. (*Id.* ¶¶ 97-98.) Despite Rodgers's complaints, Katz did not "meaningfully interview" him about the incidents, did not interview any co-workers who had witnessed the incidents, and did not instruct Klapper to "stop making discriminatory remarks concerning [Rodgers's] perceived religion." (*Id.* ¶¶ 99-102.) Rodgers asserts that "[n]o corrective action was taken" in response to his concerns about Klapper's behavior. (*Id.* ¶ 104.)

After Rodgers complained to Katz, Klapper "continued making substantially similar comments regarding [Rodgers's] perceived religion, appearance, beard, and name"; Rodgers contends that the failure to discipline Klapper was taken as a sign that "the discriminatory

conduct would be tolerated." (*Id.* ¶¶ 106, 108.) Rodgers states that he "became increasingly anxious and concerned about his continued employment," but continued reporting to work and performing his job duties. (*Id.* ¶¶ 109-110.) In October and November 2023, Klapper began "intentionally referring to [Rodgers] by the incorrect named 'Farheem' rather than [his] correct name 'Faheem.'" (*Id.* ¶ 111.) Rodgers corrected Klapper, but Klapper continued referring to Rodgers by the incorrect name, including in communications with others employees, which Rodgers inferred "was inten[ded] to ridicule . . . [Rodgers] because of his ethnic name and Defendant's continued perception that Rodgers was Muslim." (*Id.* ¶¶ 114-115.)

On or about November 1, 2023, Klapper tasked Rodgers and another employee named Keshawn Gilmore with clearing out a vacant apartment, Unit 410. (*Id.* ¶¶ 126-27.) Klapper told Rodgers and Gilmore they could take any property left in the apartment after clearing it out, which was standard practice in "turning over" a vacant apartment. (*Id.* ¶¶ 127-29.) On November 2, Rodgers and Gilmore went to Unit 410 and "removed property . . . in accordance with the instructions provided by . . . Klapper." (*Id.* ¶¶ 135.) Several hours after clearing out Unit 410, Klapper informed Rodgers and Gilmore that there had been a mistake; the apartment should not have been emptied. (*Id.* ¶¶ 139-40.) Klapper instructed Rodgers and Gilmore to immediately return every item that had been removed from Unit 410, which Rodgers did. (*Id.* ¶¶ 141-43.)

On November 7, 2023, Rodgers was called into a meeting with three Montium managers, including Katz, Human Resources Director Debra Fontanarosa, and Chief Operating Officer Shimmy Szanzer. (*Id.* ¶¶ 149-50.) At the meeting, Fontanarosa questioned Plaintiff about the property removed from Apartment 410. (*Id.* ¶ 151.) She called Rodgers "a liar," "a thief," and "untrustworthy." (*Id.* ¶¶ 167-69.) Rodgers explained that Klapper had instructed him and

Gilmore that they were permitted to remove any personal items because the apartment had been approved for clean-out. (*Id.* ¶ 152.) The managers played Rodgers a surveillance video showing him carrying bags from Unit 410 to his vehicle. (*Id.* ¶ 157.) Upon watching the video, Rodgers realized that he may have neglected to return one bag of items to Unit 410. (*Id.* ¶ 158.) He told the Montium managers that he would return home right away and if he still had any property from Unit 410 he would retrieve and return it immediately. (*Id.* ¶ 159.) Rodgers went home and returned with a bag of baby clothes he had mistakenly not returned to the unit. (*Id.* ¶¶ 162-63.) When he arrived back to work, Rodgers observed Gilmore enter Manager Mark Fayne's office with a bag of clothes. (*Id.* ¶ 175.) Rodgers believes the bag contained items that Gilmore had taken from Unit 410 and similarly had neglected to return until November 7. (*Id.* ¶ 176.) However, Rodgers asserts that Gilmore, unlike him, was not called a liar, a thief, or untrustworthy by management for engaging in the exact same conduct as Rodgers. (*Id.* ¶¶ 180-82.) Rodgers was terminated based on the incident, while Gilmore was not. (*Id.* ¶ 183.) Rodgers contends the difference in treatment was due to him being "repeatedly perceived by Defendant to be Muslim" and having a darker complexion, "while . . . Gilmore was not subjected to similar comments concerning his name, appearance, beard, or religion." (*Id.* ¶¶ 184-85.)

Rodgers asserts that after he was terminated, Montium opposed his application for unemployment benefits by claiming that Rodgers had engaged in work-related misconduct, based on the Apartment 410 incident. (*Id.* ¶ 187.) After Rodgers's benefits were denied, he appealed and ultimately won before the Pennsylvania Unemployment Compensation Board of Review. (*Id.* ¶ 192.) The Board issued a Decision and Order on December 18, 2024, reversing the initial denial, finding that Rodgers had removed items from Apartment 410 pursuant to

instructions from Klapper, that Rodgers had inadvertently neglected to return one bag of items to the apartment, and that he had not engaged in theft or willful misconduct. (*Id.* ¶¶ 192-201.)

Rodgers also alleges that the handling of his termination by TriNet, Montium's human resources administrator, supports the claim that he did not engage in theft or any misconduct. He provides a copy of the separation notice sent by TriNet and notes that it states only that his employment relationship had ended, with no mention of theft, dishonesty, or violation of company policy. (*Id.* ¶¶ 204-10.) Rodgers filed a charge of discrimination with the Equal Employment Opportunity Commission and received a Notice of Right to Sue Letter on July 15, 2025, which he attached as an exhibit to the SAC. (*Id.* at 17, 31-32.)

Based on the above allegations, Rodgers asserts Title VII claims of employment discrimination, a hostile work environment, and retaliatory termination. (*Id.* at 18-21.) He seeks back pay, front pay, compensatory damages, punitive damages, costs, interest, and such other relief as the Court deems just and proper. (*Id.* ¶ 233).

## II. STANDARD OF REVIEW

Because the Court previously granted Rodgers leave to proceed *in forma pauperis*, his case remains subject to screening pursuant to 28 U.S.C. § 1915(e)(2)(B). This requires the Court to screen and dismiss the SAC if it fails to state a claim. Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[,]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 560 U.S. 544, 556 (2007)). At this early stage of the litigation, the Court will accept the facts alleged

in the *pro se* complaint as true, draw all reasonable inferences in the plaintiff's favor, and ask only whether the complaint contains facts sufficient to state a plausible claim. *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197, 204 (3d Cir. 2024). Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678.

Because Rodgers is proceeding *pro se*, the Court construes his allegations liberally. *See Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)). The Court will "apply the relevant legal principle even when the complaint has failed to name it." *Id.* (quoting *Mala*, 704 F.3d at 245). However, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Id.* (quoting *Mala*, 704 F.3d at 245). An unrepresented litigant "cannot flout procedural rules — they must abide by the same rules that apply to all other litigants." *Mala*, 704 F.3d at 245; *see also Doe v. Allegheny Cnty. Hous. Auth.*, No. 23-1105, 2024 WL 379959, at *3 (3d Cir. Feb. 1, 2024) (*per curiam*) ("While a court must liberally construe the allegations . . . this does not require the court to act as an advocate to identify any possible claim that the facts alleged could potentially support.").

## III. DISCUSSION

Rodgers asserts Title VII claims of discriminatory termination, hostile work environment, and retaliation based on his race, color, and religion. Because Rodgers has alleged sufficient factual allegations to state a claim for relief, his color-based discriminatory termination, religion-based hostile work environment, and retaliation claims are plausible and will proceed to service, but the remaining claims are not plausible and will be dismissed.

### A. Discriminatory Termination

Title VII prohibits "discrimination in employment based on several personal characteristics" including race, color, religion, national origin, and sex. *See E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 448-49 (3d Cir. 2015) (citing, *inter alia*, 42 U.S.C. § 2000e-2(a)). A plaintiff may state a claim for employment discrimination by pleading facts to support that: (1) he is a member of a protected class, (2) he was qualified for the position he either held or sought, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. *See Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 241 (3d Cir. 2007) (*per curiam*); *see also Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 973-74 (3d Cir. 1998).

To plead a claim under Title VII, a plaintiff need not allege each element necessary to establish a prima facie case. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). Rather, at the pleading stage, a plaintiff must allege facts that provide fair notice of his claims and demonstrate a plausible right to relief. *See Twombly*, 550 U.S. at 555 (requiring plaintiffs to allege facts sufficient to "raise a right to relief above the speculative level"). Thus, to pass statutory screening under 28 U.S.C. § 1915(e)(2)(B)(ii), the complaint must "put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009).

Rodgers alleges that he was terminated in part because he was perceived by his employer to be Muslim. As the Court previously discussed, *see* April Memorandum, 2026 WL 1079294, at *3, a threshold question in evaluating Rodgers's allegation is whether *perceived* religion is a protected class under Title VII. Some courts take the view that, unlike perceived disability claims under the Americans with Disabilities Act, under Title VII perceived membership in a protected class does not give rise to a plausible claim. *Id.* (first citing *Lewis v. N. Gen. Hosp.*,

502 F. Supp. 2d 390, 401 (S.D.N.Y. 2007) (holding that plaintiff's "perceived religion claim . . . fails as a matter of law, for the protections of Title VII do not extend to persons who are merely 'perceived' to belong to a protected class" and reasoning that "if Congress had wanted to permit a . . . cause of action under Title VII for 'perceived religion' discrimination [similar to "perceived disability" claims under the ADA], it could have so provided. It did not."); then citing *El v. Max Daetwyler Corp.*, No. 09-415, 2011 WL 1769805 (W.D.N.C. May 9, 2011) (collecting cases and noting that "[w]hile a *perception* that a person is suffering from a disability is actionable under the Americans with Disabilities Act, it does not appear that Title VII recognizes such a claim."), *aff'd*, 451 F. App'x 257 (4th Cir. 2011). However, the Court noted that at least one Court in this Circuit has denied summary judgment on a Title VII hostile work environment claim based on the plaintiff's perceived religion. *Id.* (citing *Smith v. Specialty Pool Contractors*, No. 07-1464, 2008 WL 4410163, at *5 (W.D. Pa. Sept. 24, 2008)). In that case, the defendant's employee repeatedly harassed a Catholic co-worker who had a Jewish parent, apparently perceiving the co-worker as both ethnically and religiously Jewish despite the plaintiff's repeated statement that he was Catholic. *Smith*, at *5. The defendant filed a motion for summary judgment, arguing that plaintiff "cannot maintain a claim that he has been subjected to religious harassment because his religious creed is not Judaism." *Id.* In rejecting this argument, the court cited dicta from the United States Court of Appeals for the Third Circuit that appeared to support a hypothetical "Title VII discrimination case in which an employer refuses to hire a prospective employee because he thinks that the applicant is a Muslim," reasoning that "[t]he employer is still discriminating on the basis of religion even if the applicant he refuses to hire is not in fact a Muslim." *Id.* (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561 (3d Cir. 2002)). Like the plaintiff in *Smith* and in the Third Circuit's hypothetical case, Rodgers alleges

facts indicating that he suffered discrimination on the basis of religion, even if it was not in fact his religion. Given the unsettled nature of the law on the issue of whether discrimination based on perceived religion can be a basis of Title VII liability and the Third Circuit's apparent receptivity to a perception theory, the Court will not dismiss Rodgers's claim on this ground.

Rodgers's religion-based discriminatory termination claim fails, however, because he again does not plausibly allege that his employer perceived him to be Muslim or that he was terminated based on such a perception. Rodgers repeatedly refers to "Defendant's" perception that he was Muslim and to "Defendant's" discrimination based on Rodgers's religion. (*See, e.g.*, SAC ¶¶ 13, 86, 114, 185, 214-215.) Rodgers appears to impute to Montium the views and conduct of a single employee, Turn Manager Joe Klapper, in order to allege a causal connection between Klapper's anti-Muslim bias and Rodgers's termination. As in Rodgers's prior complaints, however, there are no facts in the SAC linking Klapper's perception that Rodgers was Muslim to his termination. There are no facts indicating that Klapper had any involvement in the decision to terminate him. Nor does Rodgers allege that any Montium staff other than Klapper believed Rodgers to be Muslim or expressed any anti-Muslim bias. Thus, Rodgers fails to assert facts to support a causal connection between his perceived religion and his termination.

For the same reasons discussed in the Court's initial screening memorandum, however, Rodgers plausibly alleges that he was subject to disparate discipline based on his color. Rodgers asserts that he was fired for neglecting to return certain items to Unit 410, while his lighter-skinned co-worker Keshawn Gilmore was not disciplined at all despite apparently engaging in the same misconduct. (SAC ¶¶ 180-83.) Accepting all inferences in his favor, Rodgers plausibly alleges that the harsher discipline to which he was subjected was due to his darker

color. Accordingly, his color-based employment discrimination claim will be served for a responsive pleading.

**B. Hostile Work Environment**

As the Court previously explained to Rodgers, to plead a hostile work environment claim, a plaintiff must allege: (1) he suffered intentional discrimination because of membership in a protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. *June Memorandum*, 2026 WL 1893900 at *3 (first citing *Starnes v. Butler Cnty. Ct. of Common Pleas*, 971 F.3d 416, 428 (3d Cir. 2020); then citing *Felder v. Penn Mfg. Indus., Inc.*, 303 F.R.D. 241, 243 (E.D. Pa. 2014)).

Rodgers does not specify what form(s) of discrimination give rise to his hostile work environment claim. Because he asserts a claim of employment discrimination based on his race, color, and perceived religion, the Court understands him to assert his hostile work environment claim on the same grounds.

**1. Perceived Religion**

As discussed above, Rodgers's perception-theory Title VII religious discrimination claim cannot be discounted as a matter of law. Thus, the Court finds that the allegation that he suffered discrimination based on the perception that he was Muslim satisfies the first element of a hostile work environment claim for purposes of Title VII. Rodgers also alleges facts sufficient to plausibly plead the other elements of a hostile work environment claim. He alleges that he was subjected to pervasive harassment by Turn Manager Joe Klapper for more than three months, based on Klapper's professed belief or suspicion that Rodgers was Muslim, despite Rodgers repeatedly explaining that he was not. Rodgers states that "nearly every workday" from August

2023 to his termination in November 2023, Klapper engaged in unwelcome comments and questions about him supposedly being Muslim, including comments about his beard, his name, and his diet. (SAC ¶¶ 47-74.) Rodgers alleges that the repeated comments and questions, which were often made in front of other employees, eventually caused him to feel "embarrassed, anxious, humiliated, and apprehensive about reporting to work." (*Id.* ¶ 73.) Given Klapper's allegedly offensive questioning of his religion, diet, and constant comments regarding his appearance, Rodgers plausibly alleges behavior that detrimentally affected him and would have detrimentally affected another person in his position. He also alleges a basis for employer liability, because he reported the behavior to Mark Katz, part of Montium's management team, and Katz failed to take any corrective action to prevent the harassment, which continued unabated after Rodgers's complaint. *See Jensen v. Potter*, 435 F.3d 444, 453 (3d Cir. 2006) (explaining that "[i]n order to establish employer negligence [in support of a hostile work environment claim], the plaintiff must show that management knew or should have known about the harassment, but 'failed to take prompt and adequate remedial action.'") (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir. 1990)). Rodgers's hostile work environment claim will therefore be served for a responsive pleading.

**2. Race and Color**

Rodgers does not, however, plausibly allege a hostile work environment claim based on his race or color. There are no facts suggesting that Klapper made any comments or asked any questions relating to Rodgers's race or dark skin, or that his view of Rodgers as Muslim was connected to his race or color. His assertion that Klapper's "repeated comments were intended to ridicule him because of his race, color, appearance, and Defendant's perception of his religion" (SAC ¶ 74) is conclusory and does not plausibly allege a claim based on race or color.

*See Iqbal*, 556 U.S. at 678 (explaining that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim). Rodgers's Title VII claim based on those protected characteristics will therefore be dismissed.

**C. Retaliation**

Title VII prohibits an employer from retaliating against an employee (a) for opposing any act made unlawful by the employment discrimination statutes, or (b) because he made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under the employment discrimination statutes. *See* 42 U.S.C. § 2000e-3; *Allstate Ins. Co*., 778 F.3d at 449. To state a claim for retaliation, a plaintiff must allege that: (1) he engaged in conduct protected by Title VII; (2) the employer took adverse action against him; and (3) a causal link exists between his protected conduct and the employer's adverse action. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016); *see also Larochelle v. Wilmac Corp.*, 769 F. App'x 57, 60 (3d Cir. 2019). A causal connection can be alleged plausibly where a plaintiff asserts either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism, coupled with timing, to establish a causal link. *See Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014). Further, evidence of causation may be "gleaned from the record as a whole." *Vaticano v. Twp. of Edison*, 514 F. App'x 218, 225 (3d Cir. 2013) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

Rodgers asserts that he was terminated "approximately one month" after reporting Joe Klapper's discriminatory behavior to Mark Katz and that "the close temporal proximity between [his] protected activity and Defendant's decision to terminate [his] employment supports a reasonable inference of retaliatory motive." (SAC ¶¶ 254-60). While the one-month gap

between Rodgers's meeting with Katz and his termination does not by itself constitute unusually suggestive timing, combined with the alleged pattern of antagonism by Klapper after the meeting with Katz, including religion-based harassment and undesirable assignments not given to other employees, Rodgers asserts a plausible Title VII retaliation claim. *See Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 615 (E.D. Pa. 2014) (explaining that a causal connection may be pled by facts "showing actual antagonistic conduct or animus in the intervening period, between the protected activity and the retaliation.'") (citation and internal quotation marks omitted). This claim will therefore be served for a responsive pleading.

## IV. CONCLUSION

For the foregoing reasons, Rodgers's SAC will be dismissed in part for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(b)(ii). His Title VII color-based discriminatory termination claim, his Title VII religion-based hostile work environment claim, and his Title VII retaliation claim will be served for a responsive pleading. His remaining claims are dismissed without prejudice. An appropriate Order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.